COURT OF APPEALS
DECISION
DATED AND FILED

October 9, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.  2023AP662**

**STATE OF WISCONSIN**

Cir. Ct. No.  2021FA401

**IN COURT OF APPEALS
DISTRICT II**

IN RE THE MARRIAGE OF:

HEIKE BAIERL,

   PETITIONER-APPELLANT,

 V.

ROBERT JOHN BAIERL,

   RESPONDENT-RESPONDENT.

APPEAL from orders of the circuit court for Waukesha County: WILLIAM J. DOMINA, Judge.  *Reversed and cause remanded for further proceedings*.

Before Gundrum, P.J., Neubauer and Grogan, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.  Heike Baierl appeals a circuit court order granting her estranged husband Robert Baierl's motion to partially stay the underlying divorce action.  The circuit court granted the stay after determining that Heike's marital waste and property division claims were business claims subject to arbitration and that Robert did not waive his right to request arbitration.  Heike also appeals an order removing the divorce trial from the court's calendar until arbitration is complete and an order denying her motion for reconsideration.  On appeal, Heike challenges the circuit court's determination that her claims are arbitral.  Alternatively, she argues that Robert waived his right to request her claims be submitted to arbitration.  We conclude Robert waived his right to arbitration of these claims.  We therefore reverse the circuit court's order granting Robert's stay request and remand the case for further proceedings consistent with this opinion.

## BACKGROUND

¶2     Heike and Robert were married in 1965.  They have four adult children:  Marlene, Kelly, Kim, and Jonathan.  During their marriage, and as relevant to this appeal, Heike and Robert invested in and ultimately amassed a multi-million dollar apartment portfolio.  The apartment portfolio was placed under various LLCs for administrative and liability purposes.  Heike and Robert also established a company, Supreme Builders, Inc. to manage their property.

¶3     Robert is a director and managing member of the LLCs and the corporation.  In general, Heike and Robert own approximately ninety-eight percent

of almost all of the LLCs and the corporation.[1] The remaining ownership interests belong to their son, Jonathan, their daughter, Kelly, and Jonathan's wife, Jessica.

¶4 Heike and Robert have lived separately since 2008. On April 13, 2021, Heike petitioned for legal separation, which she later converted to a petition for divorce. In her petitions, she identified the apartment portfolio, both the real estate and businesses, as marital property subject to division. Litigation between the couple was immediately contested—the parties filed motions against each other along with separate legal actions. In this divorce case, the circuit court appointed a special master to:

> (1) account for real estate and other property owned by the parties through certain companies, (2) account for assets, income, debts, and liabilities associated with the operation of the companies, or associated with real estate owned by the parties otherwise, (3) facilitate the discovery of information between the parties and, as necessary, from third parties, (4) make recommendations regarding the resolution of discovery disputes, and (5) make recommendations regarding the effectiveness and enforceability of any party's transfer of rights in co-owned companies or marital assets.

The order provided that the original of every document submitted to the referee would be filed with the court; the referee would make his recommendation; a party could object to a recommendation and seek de novo review; and all recommendations ultimately approved by the circuit court would be "appealable after the final disposition of this case as if they were made by this Court."

---

[1] Heike has challenged the third-party ownership interests and the transfers of shares establishing their interests. That dispute is currently in arbitration.

3

¶5 Both parties availed themselves of the referee on numerous occasions during the pendency of this action. The referee reviewed the parties' filings and made detailed recommendations to the circuit court.

¶6 As relevant to this appeal, on December 9, 2021, Heike wrote to the referee requesting an emergency hearing regarding Robert's sale of their apartment portfolio. Heike claimed that Robert had unilaterally negotiated a sale of their apartment portfolio's real estate for $59 million but that her expert believed the property had a higher fair market value. At a hearing and following the parties' arguments, the referee made various findings. The referee determined that it could and would grant approval of the sale without Heike's consent. The referee also determined that it did not need to resolve the fair market value of the apartment portfolio before approving the sale. The referee explained:

> I think the parties, like in any proceeding, deserve the opportunity to marshal their expert opinion evidence before any judge makes a decision about the value of this property. Therefore, if this property is sold for $59 million and if $59 million is less than the fair market value of the property, it is possible -- I'm not saying it's necessarily the case, but it is possible that [Robert] will owe some duty to [Heike] when it comes to equalizing the distribution of the -- or the division of the couple's property to make up the difference for any shortfall between this sale price and the fair market value of the property.

¶7 The referee also concluded "Despite the fact I am approving this transaction, [Heike] reserves her right to object to whether the sale represents a fair market value and whether the allocation stated in Exhibit A [to the Real Estate Purchase Agreement] is accurate."

¶8 Following the hearing, in the amended Special Master/Referee Order No. 9, the referee recommended and the circuit court ordered:

1. The proposed sale of real estate to Cobalt Development Holdings, LLC ("Cobalt"), as identified in the Real Estate Purchase Agreement dated December 9, 2021 is approved.

2. Robert Baierl is authorized to negotiate and close the transaction described in the Real Estate Purchase Agreement, on the following conditions:

    ….

3. [Heike] may reserve her right to object to the admissibility and/or probative value of any statements made in Schedule A to the Real Estate Purchase Agreement.

¶9      Less than two weeks later, on December 22, 2021, Heike requested another hearing before the special master. She explained:

> There is an active purchase sale agreement for the real estate to be sold. Pursuant to the Order of [the circuit court] on April 22, 2021 the proceeds from the sale of any property in which Heike Baierl or Robert Baierl are to be held in trust. At this time, the proceeds of the sale do not need attention due to this Order containing specific direction from the court when real estate is sold, however, the cash holdings of the LLCs that are not part of the sale do require immediate attention and further Orders of the court. According to the terms of the various LLC Operating Agreements, the LLCs will be dissolved upon the sale of the real estate…. The cash holdings are of significant value and are at great risk to be funneled outside of the marital estate since only [Robert] has control over those assets.

Heike believed the amount of cash holdings held by the LLCs was approximately $4.5 million. She requested a distribution of at least fifty percent of that amount. She explained she was requesting at least fifty percent based on her belief that Robert:

> has already taken hundreds of thousands of dollars in attorney fees from the cash holdings without a signed stipulation for this withdrawal to be accounted for as an advanced distribution on property division. Because of this, we believe the first order must be to offset the amount

5

> pre-distributed to [Robert] unilaterally from the cash holdings by making an equal distribution to [Heike]. The second order then should be to distribute the remaining cash holdings equally between Heike Baierl and Robert Baierl.

¶10 The parties met with the referee and set a briefing schedule regarding Heike's request for a distribution of martial assets. On January 26, 2022, Heike, in her letter brief, outlined a number of allegedly improper actions taken by Robert in regard to their businesses during the divorce, including in part: "1) Excessive spending"; "2) Manipulation of deposits"; "3) Unexplained Shortage of Revenue"; "4) Unexplained usage of accounts where property was sold"; "5) Failure to distribute Cash Holdings from other sold properties"; "6) [$]800,000.00 distribution from LLC to Supreme Builders is being spent down"; and "7) Unexplained withdrawals."

¶11 In February 2022, as briefing concluded on Heike's request for a distribution of marital assets, Jonathan, Jessica, and Kelly moved to intervene into the divorce, stay proceedings, and compel arbitration. Robert then moved to stay the referee's ruling on Heike's request for a distribution of marital assets pending resolution of the proposed intervenors' motions. He also stated he joined in the intervenors' substantive motions.

¶12 The referee addressed all of these issues in Special Master/Referee Order No. 14. In that order, the referee first determined that "deciding whether a non-spouse may participate in this divorce and deciding whether to compel arbitration of property division issues" was outside the scope of tasks the circuit court had referred to the referee. Accordingly, the referee stated it was not going to decide those issues and the circuit court would determine whether the third parties could intervene and whether to order arbitration.

¶13   As for Robert's motion to stay the referee's ruling on Heike's request for a distribution of marital assets, the referee observed "the better course is to hold off ruling until the objections of the proposed Intervenors are resolved." However, the referee acknowledged that Heike opposed the motions in part because:

> [T]he motions of the proposed Intervenors come at the eleventh hour and after a good deal of time and effort was invested in briefing the merits of [Heike's] request. I sympathize with [Heike]. The proposed Intervenors are and have been represented by counsel who were made aware in early- to mid-December that [Heike] was asserting that there was cash on hand in the LLCs that should be distributed in advance of final property division. [Heike's] assertions were opposed from the get-go by those attorneys, yet at least eight weeks passed before any of the proposed Intervenors invoked the parties' arbitration agreement.

> [Heike] is not unjustified in questioning the motives of the proposed Intervenors. One reason courts respect arbitration agreements is that arbitration tends to be a more expeditious, less costly alternative to litigation. But in this case, arbitration offers no such relief. At the time arbitration was invoked, the issue in dispute was almost fully briefed and ready to be decided. Arbitration will not expedite a ruling on the objections of the proposed Intervenors or reduce the expense of these proceedings. Indeed, it is highly unlikely that the merits of [Heike's] claim (or the objections of the proposed Intervenors) will be heard at all before the real estate operations of the LLCs are liquidated.

> Alas, for [Heike] to assert that the proposed Intervenors' motions are untimely or that they have been waived by virtue of their participation in these proceedings, *see*, *e.g.*, ***J.J. Andrews, Inc. v. Midland***, 164 Wis. 2d 215, 223[, 474 N.W.2d 756] (Ct. App. 1991), is tantamount to asking me to rule on motions that have not been referred to me. These arguments will have to await presentation to [the circuit court].

The referee ordered "[Heike]'s request for a distribution of marital assets is stayed." The referee explained Heike was permitted to renew her request once the

sale of the apartment portfolio closed and if the parties' dispute was not resolved by mediation. The circuit court signed the referee's recommendation.

¶14 Before the circuit court ruled on the intervenors' motions, they withdrew them based on the terms in Special Master/Referee Order No. 17.[2] In April 2022, Heike then renewed her request for an advanced property division.

¶15 After more briefing between the parties, the referee found that Heike requested:

- $440,000 from the cash assets of Supreme Builders, "as a matching payment to that which [Robert] received from Supreme Builders for his personal estimated tax obligation." ...

- Half the liquidated value of an alleged note payable to the couple from Supreme Builders in the alleged amount of $2,903,000.

- An amount of cash on deposit in the businesses in which the couple owns controlling interests (Supreme Builders and several other businesses to which we have referred collectively as "the LLCs"), to offset what [Heike] claims to have been "personal expenses of $1,245,442.69, paid [to Robert] through the Supreme Builders Inc. account," which sum includes the $440,000 in personal taxes allegedly advanced on [Robert's] behalf, for items such as "gifts, personal expenses, cash draws and personal attorney fees."

---

[2] Special Master/Referee Order No. 17 provided in part that:

On the condition that (a) loans made by Mr. and Ms. Baierl individually to various business entities ("LLCs") are repaid into trust out of the proceeds of the sale of the real estate owned by the LLCs and (b) the proposed intervenors Kelly, Jonathan and Jessica Baierl are paid at closing the net proceeds allocable to their proportionate share of each LLC, then the requests to intervene filed by all of the proposed intervenors, including the LLCs, are withdrawn.

- Half of the cash that remains in the possession of Supreme Builders and the LLCs.

¶16    In Special Master/Referee Order No. 20, which was signed by the circuit court, the referee denied Heike's request for various reasons. One reason the referee offered was that "[Heike's] claims about [Robert] using family business funds to pay for personal expenses falls within the scope of her marital waste claim, a classic issue for trial[.]" Another reason for denial was that although "[Robert] did not appear to contest … that he has paid for his own personal taxes with company funds but has not arranged for payment of [Heike's] corresponding personal taxes," Heike's "bald factual assertions" did not fulfill the evidentiary standards that must be met before a court would dispose of a claim without a trial.

¶17    After that determination, additional motion practice continued between the couple. In September 2022, the parties agreed to a scheduling order in anticipation of trial. The parties agreed to disclose expert witnesses on October 5, disclose expert reports on October 31, and disclose rebuttal experts and fact witnesses on November 4. The parties made the witness disclosures as required.

¶18    On November 10, 2022, Robert moved, in part, "TO STAY ALL BUSINESS MATTERS IN THIS ACTION FOR LACK OF JURISDICTION." Robert explained he had just reviewed Heike's expert reports and "learned for the first time that Heike intends to assert claims against him that relate directly to acts taken by the business entities regarding business assets, through Robert in his capacity as managing member." Specifically, Robert asserted that "Heike will seemingly attempt to claim that Robert, while acting in his capacity as managing

member, conducted business in a manner contrary to her interest as a member or shareholder of the business entities" in various ways:

- Excessive spending of Supreme Builders, Inc. funds, (*see* Dkt. #530);[3]

- Under-renting of apartment units relative to the applicable industry standard, (*see* ***id.***);

- Failing to distribute to Heike $3,231,556.00 of cash to which she claims as an entitlement but for a loan strategy implemented by Robert and his accountant, (*see* Dkt. #508);[4]

---

[3] Docket No. 530 is not an expert report, but it is Heike's "Disclosure of Fact and Rebuttal Expert Witnesses." It was filed on November 4, 2022 pursuant to the scheduling stipulation. In this witness list, Heike identified three expert rebuttal witnesses and twenty-five lay witnesses. As to the first rebuttal expert witness, Andrew Hess, Heike stated:

> It is anticipated that Mr. Hess will testify in rebuttal of [Robert's] allegations of likely brokerage fees saved and [Robert's] alleged amount he says he should have received as a brokerage fee. Mr. Hess will also testify on the excessive spending of the management company and under-renting of the apartment unit portfolio. He will also testify as to [Robert's] management as it relates to historical revenues of the apartment portfolio versus the industry standard, and the alleged expertise of [Robert] as presented in his expert reports and anticipated testimony. He will also testify as to related expert testimony to the sale of the apartment investment portfolio including the statements made in the expert report by [Robert] to Ms. Knowles. Additionally, he will testify as to the reasons and contributions resulting in growth of the apartment and property investment portfolio.

[4] Docket No. 508 is Dave Schultz, CPA's expert report. On October 5, 2022, Heike advised:

> Mr. Schultz will testify regarding his analysis of the marital estate, the historical tax related records, business records and other financial records of the parties and the various entities owned by the parties to this action ("Baierl Entities"). He will provide testimony regarding the operations of the businesses, assets, loans, accounting practices, transfers and other related testimony supporting any related claim of the Petitioner including fair property division and marital waste.

10

- Arranging for the sale of all real estate holdings without Heike's approval, (*see id*);

- Underselling the apartment unit portfolio and Greenfield Park II, LLC, by $9,000,000.00, (*see* Dkt. #515);[5]

- Underpaying Heike in the amount of "at least" $2,670,894.00 between January 1, 2018, and August 31, 2022, (*see* Dkt. #506);[6] and

- Providing gifs to three [sic] of the parties four children, specifically, Kelly Baierl, Jonathan Baierl, and Jessica Baierl.[7]

¶19     In his motion, Robert explained that he "and Heike each signed operating agreements … that contained broadly worded arbitration provisions[.]" Specifically, he stated that each of the business entities' operating agreements contained the following arbitration provision:

---

[5] Docket No. 515 is Andrew J. Hess's expert report.  On October 5, Heike advised that "Mr. Hess … will testify regarding the value of the real estate of the Baierl Entities and the value of Baierl Entities, appropriate brokerage fees, and testimony regarding Supreme Builders, Inc.'s management of said properties and any related claim of the Petitioner including fair property division and marital waste."

[6] Docket No. 506 is Tracy L. Coenen, CPA, CFF, MAFF's expert report.  On October 5, Heike advised:

> Ms. Coenen will testify regarding her forensic analysis including the analysis of the financial and business records of the parties and the various entities owned by the parties to this action ("Baierl Entities").  She will provide testimony regarding the operations of the businesses, assets, loans, accounting practices, transfers and other related testimony supporting any related claim of the Petitioner including fair property division and marital waste.

[7] The couple's four children are Marlene, Kelly, Kim, and Jonathan.  Jessica is not one of the couple's four children; she is their daughter-in-law.

Section 11.7. Dispute Resolution.

(a) Disputes. Any dispute arising with respect to this Agreement, in its making or validity, its interpretation, or its breach shall be settled by arbitration in Waukesha County, Wisconsin, by a single arbitrator mutually agreed to by the disputing parties pursuant to the then obtaining rules of the American Arbitration Association. Such arbitration shall be the sole and exclusive remedy for such disputes except as otherwise provided in this Agreement. Any award rendered shall be final and conclusive upon the parties, and a judgment may be entered in any court having jurisdiction.

Robert argued that because of these arbitration provisions, "this Court is compelled to hold that any decision related to the businesses value, or Robert's actions as managing member, or any other Entity-related issues is outside the scope of the Court's jurisdiction." Robert, requested, in part:

An order that all issues related to the Entities, including but not limited to Heike's allegations, the contested valuation of the Entities, the issues raised by the experts in their reports, and Robert's actions as managing member, be stayed so that Heike may proceed with her claims in arbitration[.]

¶20 Heike opposed the motion. She argued that: (1) Robert's personal use of cash holdings from the parties' company Supreme Builders, Inc. and his unilateral sale of the parties' multi-million-dollar marital apartment portfolio were martial waste claims not subject to arbitration; (2) even if the claims were subject to arbitration, Robert's failure to seek arbitration during the course of the divorce action constituted waiver of his right to arbitration; and (3) the management company, Supreme Builders, Inc., was not subject to an arbitration clause.

¶21 In terms of Heike's waiver argument, Robert replied that he believed she withdrew her claims regarding the sale and he "expressly and consistently asserted throughout briefing on both of Heike's advanced property distribution

motions that arbitration was required as to specific issues presented in Heike's motions."

¶22 The circuit court granted Robert's motion. It determined:

> What the Petitioner, Heike, claims are marital waste issues that result from the Respondent, Robert's, manipulation and abuse of the business entities by disposing of or encumbering business assets clearly presents a complaint surrounding the operation of the business entities. Moreover, the claims about business management and operations implicate the rights of third parties. The Court will not conclude that the enforceability of the arbitration provisions have been waived by the Respondent, Robert. This issue had been identified in the Spring of 2022 as note[d] in Special Master Order No. 14 and resulting in arbitration submissions. The Court concludes that this issue has not been dormant and, finally, because of the acknowledgment by the Petitioner, Heike, that … all the business entities are "tightly intertwined and aligned" the Court concludes that the arbitration clauses expressed in some of the governing documents applies to all business entities.

It partially stayed the divorce action pending arbitration. It also imposed a sixty-day limit for Heike to assert in arbitration all the claims she attempted to raise in the divorce proceeding. After the court determined that the parties' divorce claims could not be determined before arbitration, it removed the divorce trial from its calendar. Heike appeals.

## DISCUSSION

¶23 On appeal, Heike challenges the circuit court's determination that her claims are arbitral. Alternatively, she argues Robert waived his right to request her claims be submitted to arbitration. We begin with her argument that Robert waived his right to request her claims be submitted to arbitration because our resolution on that issue disposes of the appeal.

13

¶24    "Wisconsin has a policy to encourage arbitration as an alternative to litigation." *J.J. Andrews*, 164 Wis. 2d at 223. "The purpose of arbitration is to obtain a speedy, inexpensive and final resolution of disputes, and thereby avoid the expense and delay of a protracted court battle." *Id.* at 223-24.

¶25    However, even if an arbitration clause properly includes a party's claims, "there are circumstances where a party may be deemed to have waived arbitration." *Meyer v. Classified Ins. Corp. of Wis.*, 179 Wis. 2d 386, 392, 507 N.W.2d 149 (Ct. App. 1993). The general rule on waiver is that:

> [A]ny conduct of the parties inconsistent with the notion that they treated the arbitration provision as in effect, or any conduct which might be reasonably construed as showing that they did not intend to avail themselves of such provision, may amount to a waiver thereof and estop the party charged with such conduct from claiming its benefits.

*Id.* (citing *City of Madison v. Frank Lloyd Wright Found.*, 20 Wis. 2d 361, 387, 122 N.W.2d 409 (1963)). "Parties know how important it is to settle on a forum at the earliest possible opportunity, and the failure of either of them to move promptly for arbitration is powerful evidence that they made their election—against arbitration." *Cabinetree of Wis., Inc. v. Kraftmaid Cabinetry, Inc.*, 50 F.3d 388, 391 (7th Cir. 1995). We ask whether the party did "all it could reasonably have been expected to do to make the earliest feasible determination of whether to proceed judicially or by arbitration[.]" *Id.*

¶26    "Whether a party's conduct constitutes a waiver of the right to arbitrate presents a mixed question of fact and law." *Kirk v. Credit Acceptance Corp.*, 2013 WI App 32, ¶41, 346 Wis. 2d 635, 829 N.W.2d 522. "We set aside the circuit court's findings of fact only if they are clearly erroneous." *Id.* "'However, the application of the facts to a legal standard, such as waiver, is a

question of law that we review independently of the [circuit] court.'" *Id.* (citation omitted).

¶27    Heike asserts Robert waived his right to request that her claims be submitted to arbitration based on his litigation conduct.  Robert's response to Heike's assertion is seemingly contradictory.  On one hand, Robert argues that he did not know that Heike's marital waste and property division claims were actually business-related claims subject to arbitration until October 31, 2022 (the day she filed her expert reports) and he promptly moved for arbitration ten days later.  On the other hand, Robert argues that throughout the divorce proceeding he briefed and argued to the court that the claims being made by Heike were business-related claims subject to arbitration.

¶28    It appears as though the circuit court adopted Robert's latter argument in support of its determination that Robert did not waive his right to request arbitration.  After all, the circuit court determined that Robert did not waive his right to arbitrate because arbitration "had been identified in the Spring of 2022 as note[d] in Special Master Order No. 14 and resulting in arbitration submissions.  The Court concludes that this issue has not been dormant."

¶29    However, Special Master/Referee Order No. 14 did not consider *Robert's* request for arbitration.  The order considered only the third-party intervenors' motions to intervene and to compel arbitration and Robert's motion to stay the referee's ruling on Heike's motion for an advanced marital property disbursement pending the intervenors' motions.  In Special Master/Referee Order No. 14, the referee explicitly determined it would not make a recommendation on the intervenors' motions because they were outside its delegated authority but it

would grant Robert's motion to stay so that the circuit court could resolve the intervenors' motions.

¶30    In his brief to this court, Robert emphasizes that in his motion to stay the referee's ruling on Heike's advance property disbursement motion, Robert stated that he "joins in the substantive arguments presented in both [intervenors'] motions filed on February 8, 2022." To the extent Robert's position is that he should be deemed to have moved to compel arbitration based off this statement, Robert overlooks that the circuit court never ruled on the intervenors' motion to compel arbitration because they withdrew it in April 2022. Once the intervenors withdrew their requests, Robert made no separate request for arbitration. A party invoking an arbitration provision must move to compel arbitration. *See* WIS. STAT. § 788.05 (2021-22)[8] ("Any application to the court hereunder shall be made and heard in the manner provided by law for the making and hearing of motions, except as otherwise herein expressly provided."); *see also **Kay v. Board of Educ. of Chi.***, 547 F.3d 736, 738 (7th Cir. 2008) ("[J]udges must not invoke arbitration agreements on their own motion.").

¶31    Moreover, based on Robert's assertions in his brief to this court, it appears Robert was on notice as early as December 2021 that Heike's claims were going to involve what he asserts are business-related claims. However, in response to Heike's December 2021 motion for an advance property distribution, Robert did not move to compel arbitration. Instead, he chose to file a twenty-three page brief and more than two hundred pages of exhibits. He then waited until the

---

[8] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

issue was fully briefed to "join" the third-party motions to intervene and to compel arbitration. Later, when the intervenors withdrew their intervention/arbitration motions and after Heike renewed her advance property distribution motion, Robert did not respond with a request for arbitration but again briefed the issue and filed exhibits. It seems apparent from the Record that Robert chose to proceed judicially with these claims. *See Cabinetree*, 50 F.3d at 391.

¶32    Robert nevertheless argues to this court that his position throughout the litigation was that Heike's claims needed to be arbitrated. However, the Record citations he provides do not establish that he made a request or demand that her marital waste or property division claims be arbitrated before Heike filed her expert reports.[9] Instead, Robert did not make any motion regarding arbitration until November 10, 2022—nineteen months after litigation in this case commenced and long after the issues he claims are subject to arbitration were raised. The Record does not reflect that Robert did "all it could reasonably have been expected to do to make the earliest feasible determination of whether to proceed judicially or by arbitration[.]" *See id.*

¶33    As to Robert's argument that he only learned of Heike's claims against him when she filed her expert reports, his argument is belied by the

---

[9] For example, Robert advises this court that, "At a hearing before the Referee on February 1, 2022, Robert's counsel specifically advised the Referee of Robert's position that Heike's request should be arbitrated." The Record citation provided in support of that assertion reveals that, in the context of the parties' discussion on who would broker the sale if the portfolio sale fell through, the parties decided they would brief that issue if necessary, and Robert advised the referee that, if briefed, he would argue the broker issue was subject to arbitration.

In another example, Robert advises this court that, "In a letter brief filed with the circuit court on February 4, 2022, Robert reiterated his position that arbitration was necessary." The Record citation provided in support of that assertion reveals Robert made a single reference to the word "arbitration" on page thirteen of his seventeen-page, single-spaced, sur-reply brief.

Record. The Record in this case shows that throughout the pendency of this action Heike put Robert on notice that she was challenging his personal use of cash holdings from the parties' companies as well as his sale of the parties' apartment portfolio. Robert's use of the cash holdings from the businesses formed the basis of Heike's repeated requests for an advance property distribution along with other motions related to Heike's desire to protect and account for her interest in these holdings.

¶34     The Record also reflects that Robert was put on notice that Heike was challenging the fair market value of the apartment portfolio sale. The transcript from the December 10, 2021 hearing with the referee along with the subsequent order following the hearing shows that Heike did not believe the cumulative value of the property was $59 million and she was reserving her right to contest Robert's sale of the property at the divorce trial. In her filings to the referee/court, she also offered emails from her expert, who opined that the portfolio was worth more, in part, due to below-market rents.

¶35     Although Robert claims in his brief that he believed Heike withdrew that claim based on letters that she later submitted to the circuit court stating she agreed to the purchase price, Robert overlooks that in both of those letters Heike also advises that her broker is prepared to list the portfolio for six million dollars more than the purchase price. This should have put Robert on notice that she was going to pursue her marital waste claim at trial as the parties had discussed at the hearing with the referee. Robert did not request arbitration. Instead, the parties continued to litigate all aspects of this divorce case. Robert waited until Heike filed her expert reports before he decided to request arbitration.

¶36 As stated earlier, the standard governing whether a party waived, through litigation conduct or delay, its ability to invoke an arbitration provision asks whether the party "[did] all it could reasonably have been expected to do to make the earliest feasible determination of whether to proceed judicially or by arbitration." *Id.* Applying that standard to the Record before this court, we conclude that Robert waived his right to arbitrate the marital waste and property division claims against him. If, as Robert believes, these claims are arbitral, the Record establishes those claims were at issue for months before Robert sought arbitration. During that time, Robert chose instead to litigate those claims or, in terms of the value of the portfolio, gave Heike the false impression that she would be able to prove at the divorce trial that he undersold their apartment portfolio. We therefore reverse the circuit court order and remand for further proceedings consistent with this decision.

¶37 Because we determine Robert waived his right to request arbitration of Heike's marital waste and property division claims, we do not resolve the issue of whether the circuit court erred by determining these claims were business-related claims subject to arbitration and ordering Heike to submit them to arbitration. *See State v. Blalock*, 150 Wis. 2d 688, 703, 442 N.W.2d 514 (Ct. App. 1989) (cases should be decided on narrowest possible ground).

*By the Court.*—Orders reversed and cause remanded for further proceedings.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.